Messrs. *Thomas Tolman*, of Boston, *John S. Ladd*, of Cambridge, *Benjamin Mayo*, of Orange, *John I. Baker*, of Beverly, *James Rider*, of Dartmouth, *John A. Morton* of Hadley, *Isaac Burrows*, of Bernardston.

## CASE OF JAMES M. FREEMAN, PETITIONER.

The second section of the act of 1839 c. 42, providing that the warrant for notifying a meeting for the choice of certain officers shall specify the time when the poll shall be opened, is to be considered as directory to town officers; and the omission of such specification in the warrant subjects the selectmen to the penalty provided in the act; but, except in cases of fraud, will not invalidate an election made at a meeting held in pursuance of such warrant.

The fact, that a person who claims to have been elected a representative at a meeting, at the close of which the presiding officers declared that no choice had been effected, was a candidate for the same office at a subsequent meeting, cannot impair any right acquired by him at the former meeting.

After the result of an election has been declared, it is proper for the selectmen to add to the whole number of votes, one that has accidentally escaped notice, and thereupon to make a new declaration, although the result of the election is thereby changed.

The omission, in a warrant for a meeting for the choice of representative, of an article to determine whether the town will elect one, will not preclude the town from voting upon that question, and, therefore, will not invalidate an election effected at a meeting held under such warrant.

The age of a voter may be proved by the record of his birth inserted in the town records, coupled with evidence of his identity.

If it appears from the evidence, that the poll was closed before the close of the meeting, it may be inferred, in the absence of counter evidence, that it was legally closed by a vote of the town.

At the hearing of petitioners against a claim for a seat, the committee may consider objections not stated in such petition.

No member having been returned from the town, of Bellingham, James M. Freeman, who claimed to have received a majority of the votes cast therein for a representative at the annual

meeting, petitioned[1] the house on the 7th of January, 1846, that he might be admitted to a seat, and his petition was on the next day referred[2] to the committee on elections. Two counter petitions against this supposed election, couched in the same language, and signed, the one by Charles W. Tingley and twenty-five others, and the other by Nahum Cook and thirty others, were subsequently presented and referred[3] to the same committee, who, on the 27th of January, made their report,[4] which was ordered to be printed. The report sets forth the allegations of the parties, on the one side and on the other, as follows :—

" The petitioner claims a right to a seat on the following grounds :—

1. Because, at the election duly held on the 10th of November last, the poll having been opened and closed according to law, the votes were counted and declared as follows :—whole number 163, necessary for a choice 82, and that James M. Freeman had that number and was chosen. It was immediately suggested that a vote for James J. Fiske had been overlooked. Search was made, and in one of the piles such a vote was found, and without again counting all the votes, this was added to the 163, making 164, and it required 83 for a choice, and the selectmen directed the clerk to make up his record accordingly, making no choice.

2. That the meeting was adjourned to the next day, and after three unsuccessful ballotings the meeting was dissolved.

3. Because it has since been ascertained, that two illegal votes were thrown against James M. Freeman, to wit, by John Jackson, an unnaturalized foreigner, and Martin G. Cushman, a minor.

The petitioners against the election controvert the right of Freeman to a seat for the following reasons :—

1. Because the warrant calling the meeting at which said Freeman claims to have been chosen, stated no time when the polls would be open, as required by the act concerning elec-

68 J. H. 5.     [2] Same, 8.     [3] Same, 50.     [4] Same, 127.

tions, passed March 9th, 1839, and the proceedings under said warrant are, therefore, void.

2. Said Freeman had not a majority of the votes cast at the meeting.

3. The meeting was adjourned to the next day, and said Freeman was a candidate at the adjourned meeting, and thereby waived all claims to a choice on the first day, and cannot now go back to the first meeting.

At the hearing before the committee, other objections not stated in the counter petitions were offered against the petitioner's right to a seat. In the case of Erastus Richards, member from Sharon, whose election was controverted in 1843, (*ante,* 502,) it was determined that 'allegations not set forth in the petition, nor contained in specifications, came too late, and could not be considered.' The committee, however, in the case now before them, have been willing to consider any additional objections offered by the petitioners, among which are the following:—

1. That in the warrant for calling the meeting for the 10th of November, it was not stated, that the question would be put whether the town would send a representative.

2. That the town did not vote to close the poll, and it does not appear that the poll was closed, before the meeting was closed.

3. That Paul Chilson gave a vote for Nahum Cooke, which was not counted by the selectmen."

The committee then submitted a statement of the evidence in the case, from which it appeared, that the allegations of the parties were substantially proved thereby. The only portion of the evidence, which it seems necessary to state, is that of Stephen Lewett, one of the selectmen, which was as follows:

"I am one of the selectmen of Bellingham, and presided as chairman of the selectmen during the meeting of the 10th of November. No vote was passed by the meeting to send a representative. After the poll was closed, the votes were sorted; the town clerk stood at my side, and when they were sorting, the names of the candidates were given by me to the clerk. After the votes were sorted, the piles for the lower candidates were first taken, and the numbers given to the clerk; those smaller piles were then brushed aside to make room for counting the larger piles. I think I perfectly remember giving the name and number of the vote for J. J. Fiske; I have no

doubt as to giving both the name and number. After the smaller piles were brushed aside, and the larger counted, the numbers were given to the clerk, and he put them down, as I supposed. The clerk then added them up, and the whole number added was 163; James M. Freeman then had 82; the selectmen made the declaration of the result from Mr. Freeman's record, without reckoning it up themselves; the selectmen first announced the whole number of votes, and then the number necessary to a choice, and that James M. Freeman had the number necessary to a choice, 82. The selectmen then read to the meeting the number of votes the several candidates had, as a part of their declaration. When I had read to within one or two of Mr. Fiske's name, I discovered there were no figures set against his name. I then said to Mr. Holbrook, and perhaps to Mr. Thayer, the other selectmen—'You are sure there is a vote for Mr. Fiske?' Mr. Holbrook replied, 'Certainly there was; I can pick it up here,' turning directly to the corner of the table where the smaller piles had been brushed up. The vote for Mr. Fiske was then found in that pile of the scattering votes. Mr. Freeman was present at the time it was found. At my statement, Mr. Freeman carried out the number against Mr. Fiske's name, and altered the footing of the column to 164. After the mistake was corrected, I finished reading the statement of the votes for the several candidates. The declaration was then made that there was no choice. At the time of the correction, Mr. Freeman made no objection. A very few minutes were occupied in correcting the mistake."

The committee concluded their report as follows :—

" The first objection urged by the petitioners is, that, in the warrant for calling the meeting, no time was stated when the poll would be opened, as required by the act passed March 9th, 1839.

The second section of that act provides, that 'the warrant for notifying any such meeting shall specify the time or times when the poll for the choice of the several officers shall be opened.' By the 6th section of the same act, it is provided, that 'if any selectman, or any other town or city officer, shall wilfully neglect or refuse to perform any of the duties required of him by the third chapter of the Revised Statutes, or by the provisions of this act, he shall forfeit a sum not exceeding two hundred dollars.'

The committee find that in 1840, the next year after this act was passed, a construction was given by the house to the second section, so far as it relates to the choice of representatives, which has not been overruled by any subsequent decision. In the case of Silas Walker and Benjamin F. Keyes, members from West Boylston, (*ante* 394,) the report of a committee, which was agreed to by the house, is as follows :—' It is apparent that the warrant does not specify (otherwise than

by implication, if at all) the hour at which the poll should be opened. But there is no allegation or suspicion of fraud in this case, or of any injurious result arising from this omission, and it is not sufficient to vacate the seats of the sitting members.' The principle involved in this decision seems to be, that this section of the statute is to be considered as directory to town officers; that they incur the penalty prescribed in the 6th section for neglect of duty; but that such neglect, except in cases of fraud, ought not to deprive the town of its representation. Such having been the construction heretofore given to the second section of the statute, the committee do not now recommend that it should be changed or reversed. The only case which seems in the slightest degree to conflict with the foregoing decision, occurred in the year 1843, when the seat of Mr. Hannum, member from Easthampton, (*ante*, 471,) was vacated, 'because the poll was not kept open two hours, and also, that the warrant did not specify at what time the poll would be opened.' It was proved in that case, that the poll was not kept open two hours; and that fact, of itself, might, and probably did, furnish a sufficient reason for the decision that was then made. Unless the poll is kept open two hours, it can never be known that all the voters in the town have had an opportunity to exercise a right secured to them by the constitution and laws of the commonwealth.

In this connection, the committee would state, that the 8th and 10th sections of the 5th chapter of the Revised Statutes have been construed as directory to town officers. Those sections declare expressly, in what manner the selectmen and constables of towns shall give notice to persons who are chosen representatives. In the year 1845 the house decided, that where town officers had omitted to give any such notice whatever, it was a neglect of duty subjecting them to a penalty, but that such omission did not affect the validity of the election, or the correctness of the member's certificate. This decision, which is believed to be in accordance with former usage, has been confirmed by a similar decision, made during the present session.

Another objection stated in the petition is, that the meeting was adjourned to the next day, and that said Freeman, having been again a candidate, thereby waived all claims to a choice on the first day.

It appears from the town records, that the meeting was adjourned to the next day, that the vote passed on the first day not to send a representative was reconsidered, that three ballotings were had, that no choice was made, and that the meeting was then dissolved. But it appears to the committee, that no proceedings which took place on the second day can impair any rights, which the petitioner might have acquired on the first day. It appears that Freeman was again a candidate at the adjourned meeting, but that fact is wholly immaterial. No man can prevent people from voting for him for a public office, if they choose to do so; and he is sometimes surprised to find himself a candidate, without his knowledge or consent, and against his wishes.

Another objection is, that in the warrant for calling the meeting, it was not stated that the question would be put whether the town would send a representative.

The supreme judicial court, in compliance with an order of the house, passed June 13th, 1815, gave it as their opinion, that 'the right to send a representative is a corporate right vested in the towns by the constitution,' which right the town may exercise or not according to their discretion. A motion, therefore, not to send a representative is always in order after the meeting is opened; and it appears to the committee, that whenever such a motion is made, the town cannot be precluded from acting upon it, by any omission in the warrant to state that such a question would be put to the meeting. This view is sustained by the language used by the court in the opinion above referred to: 'When the town is legally assembled for the purpose of electing a representative, if a vote pass not to send one, the minority, dissenting from that vote, cannot legally proceed in the choice.'

Another objection made to the legality of the meeting is, that the town did not vote to close the poll, and it does not

appear that the poll was closed, before the meeting was closed.

It appears from the records, that the town proceeded to business, by the selectmen opening the poll at half past twelve o'clock, and that, at twenty minutes before three o'clock, the votes were counted for representative. Manning Thayer, one of the selectmen, testifies that the poll was kept open two hours. Stephen Lewett and Amos Holbrook, the other two selectmen, speak of the poll as having been closed, but do not say at what time. Lewett's testimony is, that 'after the poll was closed, the votes were sorted.' Holbrook states, that 'after the poll was closed, we sorted the votes.' It evidently appears, therefore, that the poll was closed before the meeting was closed ; and, in the absence of all proof to the contrary, the committee think it fair to infer, that the poll was legally closed by a vote of the town.

Having considered the several objections, urged by the petitioners against the legality of the proceedings, at the meeting on the 10th of November, the committee come to the inquiry whether, from the facts in the case, James M. Freeman, the petitioner for a seat, was duly elected.

The committee are of opinion, that the vote for Fiske, having been found among the scattering votes, was not included in the pile of votes for Freeman, nor counted as one of the 82 received by him, as the counsel for the petitioners suggested it might have been. The selectmen, having found a vote for Fiske, soon after they declared Freeman elected, proceeded correctly in adding it to the number of scattering votes, and in making a second declaration. It was not then known to the selectmen, that any person had voted, who was not constitutionally qualified, and they clearly discharged their duty in withholding a certificate.

That John Jackson was not a citizen of the United States, is so clearly proved, that any comment is unnecessary. By a wise provision of the constitution of this commonwealth, none but citizens are allowed the right of suffrage.

The committee are of opinion, that Martin G. Cushman

was the identical person whose birth was recorded in the town records, November 16, 1824, and that being a minor on the 10th of November last, he was not constitutionally qualified to vote.

If, then, the votes given against Freeman by Jackson and Cushman be deducted, it will give the petitioner a majority. The whole number of votes would be 162; necessary for a choice, 82; which number Freeman received. The committee, being of opinion that he received a majority of the legal votes, deem it unnecessary to consider whether there is sufficient proof that a vote was cast for Nahum Cooke. No such vote having been found by the selectmen, the burden of proof is on the petitioners, and if they have failed to establish the fact beyond a reasonable doubt, the vote ought not to be counted. But, if the vote should be admitted, it would only increase the whole number to 163, of which 82, received by Freeman, would still be a majority.

The committee, therefore, unanimously recommend the adoption of the following resolution :—

Resolved, That James M. Freeman be admitted to a seat as a member of this house."

This report was considered and agreed to[1] on the 31st of January, and Mr. Freeman at once took his seat as a representative.

On the 10th of February it was ordered,[2] that Mr. Freeman, "in making up his account for attendance during the present session, be authorized to commence on the 12th of January, that being the day when he first appeared before the committee on elections."

---

[1] 68 J. H. 163.          [2] Same, 227.